**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

_____

KATHY COX,

      Plaintiff,

v.                                           Case No. 19-12235

STATE FARM FIRE AND
CASUALTY COMPANY,

      Defendant/Third-Party Plaintiff,

v.

ANDREW HARMS,

      Third-Party Defendant.
_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND DENYING THIRD-PARTY DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Plaintiff Kathy Cox sues Defendant State Farm Fire and Casualty Company

("State Farm") for breach of contract, appraisal, and statutory interest. (ECF No. 12,

PageID.91-95.) Plaintiff alleges Defendant failed to pay her the full value of an

insurance claim for a fire that damaged her residence.

Defendant filed a third-party complaint against Plaintiff's son, Andrew Harms.

(ECF No. 3.) Defendant alleges Third-Party Defendant was negligent in overloading an

electrical circuit while running an illegal marijuana grow operation, causing the fire in

Plaintiff's residence.

Plaintiff moves for summary judgment, asking the court to order appraisal of the

property's damage. (ECF No. 26.) Third-Party Defendant also moves for summary

judgment on Defendant's negligence claim. (ECF No. 28.) The matter has been fully briefed. (ECF Nos. 30-33.) The court finds a hearing unnecessary, and for the reasons provided below, the court will deny Plaintiff's and Third-Party Defendant's motions. E.D. Mich. L.R. 7.1(f)(2).

## I.  BACKGROUND

The following facts are taken from the record established by both parties. Each fact is either agreed upon or lacks contradictory evidence.

Plaintiff owned property in Willis, Michigan. (ECF No. 12, PageID.92; ECF No. 13, PageID.98.) On June 30, 2017, Plaintiff obtained a fire insurance policy from Defendant. (ECF No. 20-3, PageID.211.) While the property was covered, on May 27, 2018, a fire occurred on Plaintiff's property, resulting in extensive damage. (ECF No. 12, PageID.92; ECF No. 13, PageID.99.) Defendant initially provided payments to Plaintiff pursuant to the policy. On August 8, 2018, Defendant issued a check in the amount of $110,969.43 for Plaintiff's "dwelling claim." (ECF No. 12, PageID.92; ECF No. 13, PageID.99.) On October 15, 2018, Defendant sent Plaintiff another check worth $13,255.00 for Plaintiff's "contents claim." (ECF No. 12, PageID.92; ECF No. 13, PageID.99.)

Plaintiff disputed the amounts received from Defendant. Most significantly, Plaintiff claimed that the house was a total loss and could not be rebuilt, requesting the policy limit of $285,248.00. (ECF No. 30-5, PageID.512, ¶ 10 (affidavit of Defendant's claim team manager).) In response, Defendant hired an outside inspector to review the damage to Plaintiff's property and determine whether the house was a total loss. (*Id.*, ¶ 13; ECF No. 30-7, PageID.522, ¶ 4 (affidavit of outside inspector).) The inspector found

that the house was not a total loss, that it could be repaired, and that, in addition to the payments already made to Plaintiff, Defendant owed an additional $16,294.47 to compensate for repairs. (ECF No. 30-5, PageID.512, ¶ 14; ECF No. 30-7, PageID.522, ¶¶ 7-8.)

After receiving the inspector's report, Defendant notified Plaintiff that it would pay her an additional $16,294.47, in line with the inspector's recommendation. (ECF No. 30-5, PageID.512, ¶¶ 15-16.) Defendant transferred that amount to Plaintiff on December 17, 2018. (*Id.*, ¶ 15; ECF No. 30-3, PageID.475 (Defendant's payment log for Plaintiff's claim).) Nonetheless, Plaintiff continued to dispute the amounts paid by Defendant. (ECF No. 30-5, PageID.512, ¶ 16-17.) Plaintiff asserted that both contractors she hired and the outside inspector Defendant hired had informed Plaintiff that the house was a total loss and could not be repaired. (*Id.*) However, the outside inspector never said such a thing to Plaintiff. (ECF No. 30-7, PageID.522, ¶ 10 (Inspector's testimony: "I never told Ms. Cox that her property could not be repaired, and was a total loss.").) In addition, Defendant reached out to one of Plaintiff's initial contractors, Scott Seidel, who stated that Plaintiff's house was "absolutely repairable." (ECF No. 30-5, PageID.513, ¶ 19; ECF No. 30-9, PageID.543, ¶¶ 7, 9; ECF No. 30-10, PageID.547.) Seidel also stated that Plaintiff had never asked him whether the home could be rebuilt and had simply requested an estimate for new construction. (ECF No. 30-5, PageID.513, ¶ 20; ECF No. 30-9, PageID.543, ¶¶ 8, 9; ECF No. 30-10, PageID.547.)

After conducting this investigation, Defendant sent Plaintiff a letter on January 10, 2019, informing Plaintiff the outside inspector and her own contractor had stated the house was repairable and that Plaintiff's request to max out the policy limit would be

3

denied. (ECF No. 30-11, PageID.549.) Defendant also warned Plaintiff that "no tarping, or other temporary repairs, has been done to keep weather or other elements from further damaging your property." (*Id.*) Defendant notified Plaintiff that it was her duty to "protect [the] property from further damage after a loss," and asked that Plaintiff "immediately hire someone to tarp the home," mentioning that such costs would be covered by Defendant. (*Id.*)

Plaintiff responded by hiring a public insurance adjuster, Mark Plaskov. (ECF No. 30-12, PageID.552 (Residential Public Adjusting Contract).) Plaskov came back with a repair estimate of $369,283.59, which became the subject of controversy. (ECF No. 30-5, PageID.513, ¶ 23.) A central issue of concern was that Plaskov did not conduct his inspection until after the house had been exposed to the elements for over seven months, referred to in Defendant's January 10 letter. (ECF No. 30-10, PageID.547 (a claim specialist employed by Defendant, noting in Plaintiff's file history that "[Plaintiff] never did anything with the property. She has not protected it from further loss."); ECF No. 30-11, PageID.549 (January 10 Letter); ECF No. 30-14, PageID.570 (Another claim specialist employed by Defendant who personally observed the dwelling stated: "I discovered that 60%-70% of the roof had remained uncovered since May 27, 2018."); ECF No. 30-13, PageID.557, 562 (Plaskov conducted his inspection between January 23 and February 3, 2019, noting that "the interior, the structure, [was] open to the elements").) In addition to calculating water damage, Plaskov valued fire damage to walls containing mold. (ECF No. 30-13, PageID.562 (Plaskov's testimony: "And what actually was damaged by the mold? . . . Drywall . . . [D]id you estimate to replace all of the drywall on the walls and the ceilings? Yes.")

4

Defendant sent another, and final, inspector to the property on March 27, 2019, this time a claim specialist hired internally by Defendant. (ECF No. 30-14, PageID.570, ¶ 7.) The claim specialist determined that the house has been exposed since May 27, 2018, the day of the fire, and that the major difference between Defendant's and Plaskov's estimates was that "[Defendant's] estimate was written nearly ten months earlier, before additional damages were caused by the property being exposed to the elements." (*Id.*, ¶ 9.) Defendant subsequently informed Plaintiff that it would be denying Plaintiff's request for additional compensation, and this lawsuit ensued. (ECF No. 30-5, PageID.513, ¶¶ 25-26.)

Before much of this controversy, on June 6, 2018—ten days after the fire—Defendant retained an investigator to determine the cause and origin of the fire. (ECF No. 31-3, PageID.643 (Defendant's Expert Disclosure).) Upon analyzing the fire scene, the electrical components of the house, and the area of the fire's origin in the attic of the home, and upon interviewing Plaintiff and a Fire Marshall, the investigator determined that "the fire was caused by [Third-Party Defendant's] marijuana growing operation." (*Id.*) Apparently, Third-Party Defendant "overloaded the electrical circuit by plugging seven LED lights, as well as a portable air conditioner and an oscillating fan . . . into a single [fifteen] ampere circuit breaker, overloading the circuit." (*Id.*) The investigator found that if Third-Party Defendant had maintained this set up, the circuit would have been tripped multiple times, requiring re-setting the breaker repeatedly. (*Id.*)

Third-Party Defendant lived at Plaintiff's residence since 2002. (ECF No. 28, PageID.376, ¶ 8; *id.*, PageID.410 (Third-Party Defendant's testimony); ECF No. 31, PageID.609, ¶ 8.) Plaintiff and Third-Party Defendant did not have a formal tenancy

5

agreement and Third-Party Defendant did not pay rent. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.412 (Third-Party Defendant's testimony: "You have no written agreement with your mother? No."); ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627 (Plaintiff's testimony: "What kind of arrangement did you have then in terms of rent for the property where the fire happened? [Third-Party Defendant] didn't pay rent at that point but he kept the place up.").) Third-Party Defendant did engage in household chores. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.407 (Plaintiff's testimony: "[Third-Party Defendant] took care of the outside, mowed the lawn, took care of any trees that fell down . . . took care of fencing, the barns, kept them up . . . kept the house clean."); ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627.)

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere

6

possibility' of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

Plaintiff moves for summary judgment on the issue of appraisal. Third-Party Defendant also moves for summary judgment, claiming he is not subject to tort liability as a tenant. The court will address each motion in turn.

### A. Plaintiff's Motion for Summary Judgment

Plaintiff asserts no coverage issues regarding her fire insurance policy remain and that the court must mandate appraisal. Under Michigan law, if a fire insurer and the insured disagree on the amount of loss of a claim, "either party may make a written demand that the amount of loss . . . be set by appraisal." Mich. Comp. Laws § 500.2833(1)(m). At that point, once the "insurer admits that a loss is covered under its policy, a court is statutorily mandated to order the parties to participate in Michigan's statutory appraisal process." *The D Boys, L.L.C. v. Mid-Century Ins. Co.*, 644 Fed. App'x 574, 578 (6th Cir. 2016). However, if issues regarding the extent of coverage remain, "a court is to determine coverage . . . before an appraisal of damage to the

property." *Auto-Owners Ins. Co. v. Kwaiser*, 476 N.W.2d 467, 469-70 (Mich. Ct. App. 1991); *Dupree v. Auto-Owners Ins. Co.*, 497 Mich. 1, 4-5 (2014).

Defendant has already compensated Plaintiff for Plaintiff's fire loss and has admitted coverage, at least to an extent. (ECF No. 30-3, PageID.475 (Defendant's payment log for Plaintiff's claim); ECF No. 20, PageID.184, ¶ 3 (Defendant admitting that damage from the fire is covered and has been fully paid for).) However, Defendant argues coverage issues remain due to Defendant's assertions of fraud on the part of Plaintiff, Plaintiff's failure to protect the property from the elements, and the existence of mold.

### i.  Fraud Exclusion

Plaintiff's insurance policy contains the following condition:

> Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance, whether before or after a loss.

(ECF No. 30-4, PageID.506.) The provision is statutorily mandated. Mich. Comp. Laws § 500.2833(1)(c) states that "[e]ach fire insurance policy issued or delivered in this state shall contain [a] provision [stating] . . . [t]hat the policy may be made void on the basis of misrepresentation, fraud, or concealment." Defendant argues that if Plaintiff violated the fraud condition Defendant is not required to pay Plaintiff additional funds, even if technically owed. In fact, if the condition applied, the whole policy would be void and Plaintiff would be owed nothing.

Michigan courts have established a four-element test to determine the application of fraud exclusions in insurance contracts. An insurer may void a policy under a fraud exclusion where "(1) the misrepresentation was material, (2) that it was false, (3) that

8

the insured knew that it was false at the time it was made or that it was made recklessly, without knowledge of truth, and (4) that the insured made the material misrepresentation with the intention that the insurer would act upon it." *Bahri v. ID S Prop. Cas. Ins.*, 864 N.W.2d 609, 612 (Mich. Ct. App. 2014) (quoting *Mina v. Gen. Star Indemnity Co.*, 555 N.W.2d 1 (1996)); *Shelton v. Auto-Owners Ins.*, 899 N.W.2d 744, 749 (Mich. Ct. App. 2017). "A statement is material if it is reasonably relevant to the insurer's investigation of a claim." *Bahri*, 864 N.W.2d at 612.

With facts taken in light most favorable to the non-moving party, there is a viable claim of insurance fraud. *Diebold, Inc.*, 369 U.S. at 655. The evidence of record could demonstrate that Plaintiff asserted that her residence was a "total loss" as a result of the fire and could not be repaired. (ECF No. 30-5, PageID.512, ¶ 10.) This assertion conflicted with Defendant's initial observations and compelled Defendant to hire an outside inspector. (ECF No. 30-5, PageID.512, ¶ 14; ECF No. 30-7, PageID.522, ¶¶ 7-8.) To Plaintiff's benefit, the inspector determined that Plaintiff was owed an additional $16,294.47, but, supporting Defendant's impressions, the inspector determined that the house was in fact not a total loss. (ECF No. 30-5, PageID.512, ¶ 14; ECF No. 30-7, PageID.522, ¶¶ 7-8.) Yet Plaintiff again claimed the home was unrepairable, and went on to assert that Defendant's inspector and Plaintiff's own contractor told her so. (ECF No. 30-5, PageID.512, ¶ 16-17.) However, Defendant points to evidence that its inspector never told Plaintiff the home was a total loss. (ECF No. 30-7, PageID.522, ¶ 10 (Inspector's testimony: "I never told Ms. Cox that her property could not be repaired, and was a total loss.").) This testimony is consistent with the inspector's initial report to Defendant. (ECF No. 30-5, PageID.512, ¶ 14; ECF No. 30-7, PageID.522, ¶¶ 7-8.)

Further, evidence could demonstrate that at least one of Plaintiff's own contractors concluded that the home was repairable. (ECF No. 30-5, PageID.513, ¶ 19; ECF No. 30-9, PageID.543, ¶¶ 7, 9; ECF No. 30-10, PageID.547.) Plaintiff does not contest evidence indicating that the contractor did *not* tell Plaintiff the home was a total loss. (ECF No. 30-5, PageID.513, ¶ 20; ECF No. 30-9, PageID.543, ¶¶ 8, 9; ECF No. 30-10, PageID.547.)

Thus, the record evidence, in a light most favorable to the non-moving party, can establish that Plaintiff made a false material statement of fact—that the home was not repairable—seeking to require Defendant to pay out substantially more, exhausting policy limits. *Diebold, Inc.*, 369 U.S. at 655. (ECF No. 30-5, PageID.512, ¶¶ 10, 16-17.) The determination of damages and their extent, specifically whether Defendant needed to pay to an additional amount in excess of one hundred thousand dollars to replace Plaintiff's home, is significant, a material fact. *Bahri*, 864 N.W.2d at 612. It goes to the heart of Plaintiff's claim and would be "reasonably relevant to [Defendant's] investigation of [Plaintiff's] claim." *Bahri*, 864 N.W.2d at 612. Additionally, Plaintiff attempted to bolster her assertion with claims that Defendant's own agent and Plaintiff's contractor, qualified in making damage valuations, supported Plaintiff's position. (ECF No. 30-5, PageID.512, ¶ 16-17.) Such statements are certainly relevant to "[Defendant's] investigation of [Plaintiff's] claim." *Bahri*, 864 N.W.2d at 612.

In addition to materiality, there is evidence supporting the argument that Plaintiff's claim was false. Defendant's original evaluation and subsequent inspections found that the home was "absolutely rebuildable." (ECF No. 30-5, PageID.512, ¶ 14; ECF No. 30-7, PageID.522, ¶¶ 7-8.) Plaintiff has presented no admissible evidence that

10

any qualified inspector *ever* found the home to be a total loss. Further, evidence demonstrates that Defendant's inspector never told Plaintiff he supported Plaintiff's position, and at least one of Plaintiff's inspectors has said that he never told Plaintiff the home was a total loss. *Bahri*, 864 N.W.2d at 612. (ECF No. 30-7, PageID.522, ¶ 10; ECF No. 30-5, PageID.513, ¶ 20; ECF No. 30-9, PageID.543, ¶¶ 8, 9; ECF No. 30-10, PageID.547.)

With these facts, a reasonable juror could find that Plaintiff either "knew [her statements were] false at the time [they were] made or that [she] . . . made [them] recklessly, without knowledge of truth." *Diebold, Inc.*, 369 U.S. at 655; *Bahri*, 864 N.W.2d at 612. If the record evidence establishes only that qualified inspectors found the home to be repairable, a jury may conclude that Plaintiff invented the statement, or disregarded the strong possibility that her statements were inaccurate, in order to purposefully pressure Defendant and extract higher payments. This is supported by evidence that multiple inspectors concluded that the house was repairable, and that Plaintiff was never told it was total loss. (ECF No. 30-7, PageID.522, ¶ 7-8, 10; ECF No. 30-5, PageID.512-13, ¶¶ 14, 20; ECF No. 30-9, PageID.543, ¶¶ 8, 9; ECF No. 30-10, PageID.547.) This question of Plaintiff's intent is best left for a jury to decide. Fed. R. Civ. P. 56(a); *Popovich v. Sony Music Entm't, Inc.*, 508 F.3d 348, 363 (6th Cir. 2007) ("The intent of the parties is usually a question of fact reserved for the jury.").

Lastly, a reasonable juror could infer that Plaintiff made false statements "with the intention that [Defendant] would act upon it." *Bahri*, 864 N.W.2d at 612. Assuming Plaintiff's assertions were false, there is no reason for them to have been made other than to convince Defendant to pay substantially more than had already been paid.

Evidence can establish that Plaintiff was seeking to convince Defendant that she had a substantiated claim of unrepairable total loss and was attempting to claim the maximum available under the policy. This evidence presents a question of fact for a jury. Fed. R. Civ. P. 56(a).

Plaintiff does not contest the sustainability of these potential conclusions. She cites no precedent and presents no analysis on the elements of insurance fraud exclusions. Instead, Plaintiff argues that her statements did not induce reliance. In doing so, Plaintiff cites the well-established elements of fraud: "(1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage." *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336 (1976); *Titan Ins. Co. v. Hyten*, 491 Mich. 547, 555 (2012).

However, Defendant is asserting a fraud defense based in contract, not a claim of common-law tortious fraud. Instead, Defendant points to evidence that would void Plaintiff's contractual insurance rights. None of the cases cited by Plaintiff relate to the interpretation of the contract text at issue or the standards of proof Michigan courts have established for insurance fraud exclusions. *IDS Prop. and Cas. Ins. Co. v. Kaisch*, Case No. 15-11566, 2017 WL 914605 (E.D. Mich. Mar. 7, 2017) (Parker, J.) (insurer suing an insured under common-law fraud to void a contract, without reference to a fraud exclusion term); *Hi-Way Motor Co.*, 398 Mich. at 336 (involving a statement to a franchisee outside the terms of a contract that it would be the sole franchise for trucks in

a specific region of Michigan); *Bergen v. Baker*, 691 N.W.2d 770 (Mich. Ct. App. 2004) (concerning allegedly fraudulent statements made by a real-estate seller to a purchaser to induce the sale of the property, without reference to the contract of sale); *Novak v. Nationwide Mut. Ins. Co.*, 599 N.W.2d 546 (Mich. Ct. App. 1999) (pertaining to a suit against a former employer for allegedly fraudulent employment term promises not included in the employment contract).

With genuine disputes of fact remaining, the court will deny Plaintiff's motion for summary judgment as to appraisal and will allow the issue of fraud to proceed to trial. Fed. R. Civ. P. 56(a).

### ii. Neglect and Failure to Protect Exclusion

Defendant also argues that appraisal is inappropriate because coverage issues exist as to damages caused by weather while Plaintiff's home was left uncovered. Defendant is incorrect.

The record indicates that Plaintiff failed to protect the damaged home after the fire, despite being asked by Defendant and being told Defendant would pay any expenses incurred in doing so. (ECF No. 30-10, PageID.547 (a claim specialist employed by Defendant, noting in Plaintiff's file history that "[Plaintiff] never did anything with the property. She has not protected it from further loss."); ECF No. 30-11, PageID.549 (January 10 letter sent to Plaintiff stating "no tarping, or other temporary repairs, has been done to keep weather or other elements from further damaging your property."); ECF No. 30-14, PageID.570 (Another claim specialist employed by Defendant who personally observed the dwelling stated: "I discovered that 60%-70% of the roof had remained uncovered since May 27, 2018."); ECF No. 30-13, PageID.557,

562 (Plaskov's testifying that he conducted his inspection between January 23 and February 3, 2019 and that "the interior, the structure, [was] open to the elements").) By contrast, Plaintiff presents no evidence to contradict this finding.

Plaintiff's policy excludes "any coverage for any loss" that resulted from "[n]eglect, meaning neglect of the insured to use all reasonable means to save and preserve property at and after the time of a loss, or when property is endangered by a Loss Insured." (ECF No. 30-4, PageID.498.) Plaintiff admits that this provision applies and that she is prevented from making a claim as to "any post-fire damages to the dwelling." (ECF No. 21, PageID.292; *see also* ECF No. 26, PageID.340 (Plaintiff's motion for summary judgment: "The Policy provision [on neglect] deals only with increased 'loss,' basically post loss because of a failure to mitigate . . . . The extra loss isn't covered, but the original [fire] loss is.").)

Nonetheless, Defendant maintains that Plaskov, the inspector Plaintiff principally relies on in her repair cost valuation, has included damages that were a result of Plaintiff's failure to cover her home and prevent exposure to the elements. Defendant points out that Plaskov conducted his inspection only after the house had been exposed for months. (ECF No. 30-10, PageID.547; ECF No. 30-11, PageID.549; ECF No. 30-14, PageID.570; ECF No. 30-13, PageID.557, 562.) A claim specialist hired by Defendant found that almost all the difference in valuation between Defendant's original estimate and Plaskov's was the result of this time lag, in which wind, snow, and rain damaged the unprotected property. (ECF No. 30-14, PageID.570, ¶¶ 7, 9.)

Defendant reiterates the accepted contention that Michigan insurance law mandates appraisal only when issues of coverage are fully decided. *Auto-Owners Ins.*

14

*Co*, 476 N.W.2d at 469-70. However, the accuracy of Plaskov's valuation and whether it improperly included damage excluded from coverage is an appraisal issue. Plaintiff does not contest the definitions and limits of policy coverage with regard to her neglect. Defendant presents no evidence that Plaskov believes that the policy mandates Defendant cover post-fire losses incurred due to neglect. Testimony of Plaskov supports the opposite. When asked how Plaskov could have "separat[ed] any water damage that was caused to the structure after the [fire]," Plaskov responded: "It's easy. You just write the fire damage." (ECF No. 30-13, PageID.562.) Although Defendant apparently does not believe Plaskov can distinguish between damage caused by the fire and damage caused by weather after the fire, Plaskov has stated explicitly he can. Ultimately, Defendant disagrees with Plaskov's valuation.

Michigan statute has devised a system for settling disputes over appraisal accuracy. After failing to agree themselves, the insured and the insurer select their own independent appraiser. Mich. Comp. Laws § 500.2833(1)(m). (*see also* ECF No. 30-4, PageID.500 (Plaintiff's policy explaining the appraisal process set out in statute).) Then, the appraisers conduct their own evaluation of the amounts owed to the insured and communicate their findings to each other. Mich. Comp. Laws § 500.2833(1)(m). If the appraisers agree upon an amount, the insurer must pay it. *Id.* If the appraisers disagree, the dispute goes to an impartial umpire, agreed upon by the appraisers or selected by a court. *Id.* An amount agreed upon by two out of the group of two appraisers and one umpire is the amount the insurer must pay. *Id.* This is a detailed statutory scheme, created with two levels of independence and two separate methods of dispute

resolution. If Defendant wishes to present an independent appraiser who has come to a contrary conclusion to Plaskov, Defendant may do so before a neutral umpire.

Courts have rejected insurer arguments that appraisal conflicts are coverage disputes hiding in plain sight. An oft-cited bulletin issued by Michigan's Office of Financial and Insurance Services in 2007 provides an accurate description of the law:

> Once an insurer determines that a loss is covered under the subject policy of insurance, and there is a demand for appraisal by the policyholder or insurer, disagreements between policyholders and insurers over factual issues of whether some of the damages claimed by the policyholder are part of the amount of loss caused by the covered event are part of the appraisal process. These issues do not constitute a "coverage question" for the Courts, and are manifestly included within the mandatory legislative requirements that disputes over the "amount of loss" be subject to appraisal.

*The D Boys, L.L.C.*, 644 Fed. App'x at 578 (quoting Office of Financial and Insurance Services, State of Michigan Department of Labor and Economic Growth, Bulletin 2006-07-INS (2007); *Smith v. State Farm Fire and Cas. Co.*, 737 F.Supp.2d 702, 710 (E.D. Mich. 2010) (Borman, J.); *Overall Trading, Inc. v. Hastings Mut. Ins. Co.*, No. 278859, 2009 WL 103169, at *3 (Mich. Ct. App. Jan. 15, 2009).

Thus, courts make legal determinations as to the categories of coverage; appraisers make factual findings as to whether specific damage fits into those categories or not. Where, as here, the parties do not dispute the categories of coverage, but rather whether an appraiser properly included damages within those categories, the suit is ripe for appraisal. *The D Boys, L.L.C.*, 644 Fed. App'x at 578 (citing *Smith*, 737 F.Supp.2d at 710; *Olivet Coll. v. Indiana Ins. Co.*, Case No. 98-821 (W.D. Mich. Sept. 2, 1999)) (appraisal mandated where the "insurance company admit[s] liability under the policy with respect to one piece of property (e.g. an entire house), but the insurance

16

company[y] attempt[s] to withdraw from the appraisal process because [it] allege[s] that the plaintiffs' appraisers include[] damages in their appraisal that [are] not covered under [the] respective policy."); *Travelers Indemnity Co. v. Boyne USA, Inc.*, Case No. 19-304, 2019 WL 5682803, at *3 (W.D. Mich. Apr. 23, 2019) (ordering appraisal when "[the insurer] admit[ed] liability on the [p]olicy but claim[ed] that [the insured's] appraisers [would] 'include damages in their appraisal that are not covered' under the [p]olicy."); *Overall Trading, Inc.*, 2009 WL 103169, at *3 (finding appraisal inappropriate where "[the insurer] never conceded that the [relevant] loss was covered").

If Defendant and Plaintiff end up disputing the amount of loss attributable to the fire, a determination from the appraisal process is final and Defendant must pay it. However, Defendant is not without options if appraisers abuse their powers and take on roles outside those they are delegated to perform.

First, courts can review a final appraisal award for "bad faith, fraud, misconduct, or manifest mistake." *Auto-Owners Ins. Co. v. Allied Adjusters & Appraisers, Inc.*, 605 N.W.2d 685, 688 (Mich. Ct. App. 1999); *Emmons v. Lake States Ins. Co.*, 484 N.W.2d 712, 715 (Mich. Ct. App. 1992). Although a high standard, if Defendant can prove a manifest mistake in an appraisal award, such as by showing decisively that the appraisers included damages that were caused solely by wind and rain after the fire, Defendant would be entitled to relief. *Allied Adjusters & Appraisers, Inc.*, 605 N.W.2d at 688; *see also Manifest*, Webster's Third New International Dictionary, Unabridged (2020) ("[C]apable of being easily understood or recognized at once by the mind: not obscure.").

17

Second, courts may review appraisal awards if there are disputes over coverage. *Dupree*, 497 Mich. at 5 ("If . . . [an] appraisal award is viewed as involving a matter of coverage under [an] insurance contract, then the award is not afforded conclusive effect, the policy language is not beyond the scope of judicial review."). Defendant could challenge an award if appraisers take on the role of making coverage determinations or construct their calculations in knowing violation of accepted coverage boundaries, such as by concluding certain damages occurred after the fire and still including those costs in a valuation. Defendant cannot come to court alleging a difference of opinion as to whether certain damages fit within accepted coverage categories.

Plaintiff cannot receive compensation for post-fire damages, including those caused by wind, rain, snow, or other natural elements. These costs are not related to the fire Defendant admits is covered but rather results from Plaintiff's failure to adequately safeguard the property. Nonetheless, because Defendant presents a valid fraud defense, the court will not order appraisal at this time.

### iii. Mold Exclusion

Defendant argues the accumulation of mold on Plaintiff's property prevents the court from ordering appraisal. On this issue, like that of Plaintiff's neglect, the court disagrees.

Plaintiff's policy contains an exclusion for losses from "[f]ungus, including the growth, proliferation, spread or presence of fungus." (ECF No. 30-4, PageID.485.) The provision also excludes loss of use or delay in repairing the home due to fungus, any expenses incurred removing the fungus and treating the affected parts of the home, and any testing required to confirm the absence of fungus. (*Id.*) Plaintiff admits that no

18

expenses or costs resulting from mold accumulated after the fire are covered. (ECF No. 33, PageID.689 ("[Plaintiff] hereby stipulates that no work need be paid for mold formed post-fire.").)

Defendant makes the same argument as it does for Plaintiff's neglect, claiming that Plaskov included amounts in his valuation that are attributable to mold, not fire. Evidence does demonstrate that Plaskov valued damages to portions of the property that were also affected by mold. (ECF No. 30-13, PageID.562 (Plaskov's testimony: "And what actually was damaged by the mold? . . . Drywall . . . [D]id you estimate to replace all of the drywall on the walls and the ceilings? Yes.") However, similar to Plaskov's testimony on Plaintiff's neglect, Plaskov insisted that his valuation excluded damage from mold and included damage only from the covered event, i.e., the fire. Plaskov stated: "I made sure of it when I was there [at the house] [that] . . . there is nothing to do with mold coverage written in the estimate. Everything in my estimate is [written] purely for the fire damage and damage caused by the fire department's water putting out the fire." (ECF No. 30-13, PageID.562.)

This is, again, an issue of appraisal, not of coverage. The parties admit and the court agrees that mold and damages caused by mold are not covered by Plaintiff's policy. The appraisers can look only to damages as a result of the fire in determining the amount Plaintiff is owed. If appraisers do not follow the coverage guidelines and seek to require Defendant to pay expenses the appraisers know to be mold damage, or is "manifestly" such mold damage, Defendant can challenge the final award in court. *Dupree*, 497 Mich. at 5; *Allied Adjusters & Appraisers, Inc.*, 605 N.W.2d at 688.

However, the court must await determination of Defendant's fraud exclusion claim before ordering appraisal.

Defendant attempts to avoid this conclusion by pointing to the policy's anti-concurrent causation clause. That clause prevents coverage for all loses that are caused "directly or indirectly," whether "contribute[d] to or aggravate[ed] [by]," an excluded event. (ECF No. 30-4, PageID.499.)

The term serves to reinforce a fundamental concept of insurance contract law: that "an insurance contract must be enforced in accordance with its terms" and "[a] court must not hold an insurance company liable for a risk that it did not assume." *Henderson v. State Farm Fire and Cas. Co.*, 460 Mich. 348, 354 (1999). "Clear and specific exclusions must be given effect" and "coverage under a policy is lost if any exclusion within the policy applies to an insured's particular claims." *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 567 (1992). The insured cannot attempt to maneuver around an exclusion by arguing damage was caused by both a covered event and excluded event. *Vanguard Ins. Co. v. Clarke*, 438 Mich. 463, 466, 475 (1991), *partially overruled on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 59-60 (2003), (finding events caused by an excluded event that are also caused theoretically by a covered event does not justify "nullify[ing] [the] unambiguous insurance policy exclusion"); *U.S. Fidelity & Guar. Co. v. Citizens Ins. Co. of Am.*, 506 N.W.2d 527, 529-30 (Mich. Ct. App. 1993) (rejecting "concurrent causation," finding "no compelling legal basis or policy reason to nullify [an applicable] policy exclusion," and denying coverage, despite the relevant loss being potentially caused by a covered event).

An anti-concurrent causation clause emphasizes this well-established principle and mandates that an exclusion applies even if a loss was caused only indirectly or was aggravated by the excluded event. *Dahlke v. Home Owners Ins. Co.*, No. 239128, 2003 WL 23018291, at *3 (Mich. Ct. App. Dec. 23, 2003) (finding, in an insurance policy containing an anti-concurrent causation clause, that an exclusion for mold prevented coverage for mold, despite the mold being caused by water damage, a covered event); *Sunshine Motors, Inc. v. New Hampshire Ins. Co.*, 530 N.W.2d 120, 121 (Mich. Ct. App. 1995) (analyzing an insurance contract with an anti-concurrent causation clause and ultimately rejecting considerations of "proximate cause," "principle factor[s]," or "contributing factor[s]" when "[a] policy expressly excluded coverage").

The presence of this clause in Plaintiff's policy does not affect the outcome of the case. All damage, whether it be directly or indirectly caused by, contributed to, or aggravated by mold is excluded. There is no attempt on the part of Plaintiff to assert coverage over damages that were caused by mold and also caused by fire. All that Plaintiff seeks is compensation for losses caused by the fire, excluding any damages that were caused by mold. The fact that Plaskov disagrees with Defendant and believes certain fire damages can be valued independent of mold, despite the presence of mold, does not mean Plaintiff contests the coverage of mold. *See Dahlke*, 2003 WL 23018291, at *3 (finding an anti-concurrent causation clause applicable where an insured argued that mold damage was covered in a policy, despite mold being excluded explicitly by the policy). If the court were to accept Defendant's argument, clear and unambiguous terms in favor of coverage could be nullified simply because an exclusion clause applies to one portion of the loss. *Henderson*, 460 Mich. at 354 ("[A]n insurance

contract must be enforced in accordance with its terms"). Full and accurate enforcement of exclusions terms and anti-concurrent causation clauses mandate no such result.

### B. Third-Party Defendant's Motion for Summary Judgment

Third-Party Defendant also moves for summary judgment. The success of his motion comes down to a straightforward, yet heavily disputed issue: whether a tenant who does not pay rent is liable in negligence for damages caused to property the tenant occupies.

Uncontested evidence demonstrates that Third-Party Defendant was involved in an illegal marijuana grow operation. (ECF No. 31-3, PageID.643.) The drug production required significant amounts of energy to power several LED lights, an air conditioner, and a fan. (*Id.*) This overpowered the home's electrical circuit and caused the fire that destroyed substantial portions of the residence. (*Id.*; ECF No. 30-5, PageID.513, ¶ 23; ECF No. 30-7, PageID.522, ¶¶ 7-8.) Defendant sues Third-Party Defendant seeking compensation for his alleged negligence in conducting the marijuana operation unsafely.[1]

---

[1]     In addition to moving for summary judgment, Third-Party Defendant moves for judgment on the pleadings. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (quoting *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973)). Defendant's complaint alleges the material facts of the dispute, including that Plaintiff allowed Third-Party Defendant to reside in Plaintiff's house, lived there without formal agreement, grew marijuana, and caused the fire by overloading an electrical circuit. (ECF No. 3, PageID.43-44, ¶¶ 7-16.) And beyond mere allegations, Defendant has submitted uncontested evidence supporting these facts. Whether the court assumes Defendant's allegations are true, as is done for a motion for judgment on the pleadings, or views the evidence in the light most favorable to Defendant, as is done for a motion for summary judgment, the outcome of the court's analysis is the same: the motion is denied. *Winget*, 510 F.3d at 581; *Diebold, Inc.*, 369

Third-Party Defendant argues that he did not owe a duty to Plaintiff, the owner of the residence, or her insurer, Defendant. In *New Hampshire Ins. Group v. Labombard*, 399 N.W.2d 427 (Mich. Ct. App. 1986), a property owner's fire insurer sued the owner's tenant. The tenant's daughter had started a fire that caused damage to the property and the insurer was required to cover it. *Id.* at 528. The Michigan Court of Appeals analyzed the lease contract and found it silent as to liability for negligently caused fires. *Id.* The court ruled that because "a tenant may reasonably expect that his or her rental payments will be used to cover the lessor's ordinary and necessary expenses, including fire insurance premiums," the tenant held "a position akin to the insured and will be free from tort liability for negligently caused fire damage to the premises." *Id.* at 531. The tenant was held not to have a duty. *Id.*

Negligence is a foundational tort that serves to protect and preserve individuals' persons and property from the careless acts of others. Those who must bear costs from misbehavior are afforded compensation for their loss, while those who commit the wrongdoing are required to compensate for their misdeeds. The application of negligence is as broadly encompassing as it is important. The law "imposes *on every person* engaged in the prosecution of *any* undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Riddle v. McLouth Steel Prods. Corp.*, 440 Mich. 85, 95 (1992) (emphasis added) (quoting *Clark v. Dalman*, 379 Mich. 251, 261 (1967)). Negligence law assesses responsibilities of individuals to their fellows in society, asking if the "relationship

---

U.S. at 655. Third-Party Defendant does not make a factual argument, and instead argues all tenants, even those living in conditions Defendant claims existed with Third-Party Defendant, have no duty to property owners or their insurers.

between the parties [is] of such a character that social policy justifies [the] imposition" of liability. *Lockridge v. Oakwood Hosp.*, 777 N.W.2d 511, 515 (Mich. Ct. App. 2009) (quoting Prosser & Keeton, Torts 374, § 56 (5th ed. 1984)).

Michigan courts have generally been hesitant, at least in the absence of deliberate analysis, to declare inapplicable the overriding duty to refrain from negligence. Courts must engage in an inquiry as to "whether the societal benefits of imposing a duty outweigh the social costs of imposing duties" and look to "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Hill v. Sears, Roebuck and Co.*, 492 Mich. 651, 661 (2012) (citing *In re Certified Question from Fourteenth Dist. Court of App. of Tex.*, 479 Mich. 498, 505 (2007)).

Concepts that would void the imposition of a duty of care, such as implied assumption of risk, have been carefully circumscribed. Implied assumption of risk would deny any compensation for those harmed by negligent conduct if the risks of negligence were "fully understood[]." *Bertin v. Mann*, 502 Mich. 603, 614 n.35 (2018) (quoting Restatement (Second) of Torts § 496 (Am. Law Inst. 1979)). The theory was rejected and found to have little to no basis in "foundations [of] justice." *Felgner v. Anderson*, 375 Mich. 23, 46 (1965) (rejecting implied assumption of risk as a total bar to recovery, noting it as "a defendant's doctrine which restricts liability and so cuts down the compensation of accident victims"). Even where individuals agree to relinquish their right to compensation (as in an express assumption of risk), courts must be assured that the release was "fairly and knowingly made." *Dombrowski v. City of Omer*, 502 N.W.2d 707, 709 (Mich. Ct. App. 1993) (quoting *Paterek v. 6600 Ltd.*, 465 N.W.2d 342,

344 (Mich. Ct. App. 1990)); *see also* Restatement (Second) of Torts § 496B (Am. Law Inst. 1979) (requiring courts to determine whether an express assumption of risk was done "freely and fairly," did not involve unequal bargaining power, and was not contrary to public policy); *Woodman v. Kera LLC*, 486 Mich. 228, 257 (2010) (emphasis removed) (finding a negligence waiver unenforceable when a parent signs on behalf of a child, noting that negligence liability "create[s] an incentive to exercise greater care for minors because it limits a defendant's ability to escape liability"). Those who allow others to act freely without concern of negligence cannot sign a waiver "dazed, in shock, or under the influence of drugs." *Dombrowski*, 502 N.W.2d at 709. "[T]he nature of the instrument [cannot be] misrepresented, [and] there [cannot be] other fraudulent or overreaching conduct." *Id.*

The language in *Labombard* becomes all the more aberrant with this legal context in mind. The court in *Labombard* provided no inquiry into the traditional components of duty, e.g., whether a tenant's relationship with a property owner is such that would create a legal obligation to refrain from negligence. 399 N.W.2d 427. The property owner in *Labombard* signed nothing with express terms relinquishing his right to compensation, nor did the court engage in any analysis as to whether a waiver would be enforced, even if it were contracted for. *Id.* Yet the court read into the contract an assumption that the property owner surrenders all rights to sue in negligence when he receives rental income. *Id.* Considering the recognized importance of negligence in enhancing prosocial incentives, and its central role in protecting persons and property, *Labombard's* complete exclusion of liability, supported by such a dearth of duty analysis, is remarkable.

Although a party cannot couch a negligence claim in rights conferred through contract, Michigan courts have been explicit that careless behavior outside the governing terms of a contract still carries liability in tort. "[A]n action would lie in contract if it was based solely on a defendant's failure or refusal to perform a contractual promise." *Loweke v. Ann Arbor Ceiling & Partition Co., L.L.C.*, 489 Mich. 157, 166 (2011). Nonetheless, when a contracting party breaches its general societal duty to refrain from negligent conduct, "separate and distinct from [her] contracting duty," the contracting party has created a "new hazard" that subjects her to tort liability. *Fultz v. Union-Commerce Ass.*, 470 Mich. 460, 469 (2004); *Hart v. Ludwig*, 347 Mich. 559, 565 (1956) (Where "a tort action would lie without having recourse to the contract itself," a contracting party would be liable.). Therefore, without express terms of a contract regulating rights and responsibilities for specific acts and behavior, contracting parties' duty to refrain from negligent conduct still governs. *Innovation Ventures v. Liquid Mfg.*, 499 Mich. 491, 507 (2016) (quoting *Universal Underwriters Ins. Co. v. Kneeland*, 464 Mich. 491, 496 (2001)) ("Absent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement."); *Wilkie*, 469 Mich. at 60 ("[O]ne's alleged 'reasonable expectations' cannot supersede the clear language of a contract."). Courts do not assume tort duties are extinguished simply because a contracting party can use the resources obtained through contracting to secure insurance against negligence outside the contract's scope.

The court finds a duty to exist in this case. First, traditional analysis of duty supports Third-Party Defendant's liability. Third-Party Defendant had a known and substantive relationship with Plaintiff and her property insurer. *In re Certified Question*

*from Fourteenth Dist. Court of App. of Tex.*, 479 Mich. at 506-07 (citing *Dyer v. Trachtman*, 470 Mich. 45 (2004); *Buczkowski v. McKay*, 441 Mich. 96 (1992)) (recognizing a limited duty when "there was only a limited relationship between the parties" and no duty where "there was no relationship between the parties"). Third-Party Defendant occupied Plaintiff's home and would have recognized his obligation to refrain from conduct that damaged it, and thereby impose repair expenses on Plaintiff and on her insurer in turn.

The harm caused by Third-Party Defendant's actions was foreseeable and apparent. *Hill*, 492 Mich. at 661. Powering a marijuana growing operation through a residential home's electrical circuit and a single circuit breaker would have quite obviously risked harm to Plaintiff's property and thus Plaintiff's insurer. (ECF No. 31-3, PageID.643.) It is no more than common sense, supported by the knowledge conferred through having to re-set a tripped circuit breaker over and over, that wiring seven LED lights, an air conditioner, and a fan constitutes a dangerous overload that risks sparking a fire. (*Id.*)

The burden of liability on Third-Party Defendant is not outweighed by the risk of substantial property loss due to fire. *Hill*, 492 Mich. at 661. The utility of engaging in criminal behavior (e.g. producing marijuana) is little to nothing, while the value of protecting one's home, whatever its monetary value—here in the hundreds of thousands of dollars—is substantial.

Further, even if not aberrant, the *Labombard* decision is distinguishable. 399 N.W.2d 527. In that case, the tenant had a valid written lease agreement. *Id.* At 529. The tenant was bound to contract terms and conditions regarding the upkeep of the

property "so as to reduce fire hazards and insurance rates," and the obligation to pay rent. *Id.* at 530. There are no such legally enforceable responsibilities here. Third-Party Defendant was under no contract-based obligation to refrain from risky behavior that could threaten the property. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.412 (Third-Party Defendant's testimony: "You have no written agreement with your mother? No."); ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627 (Plaintiff's testimony: "What kind of arrangement did you have then in terms of rent for the property where the fire happened? [Third-Party Defendant] didn't pay rent at that point but he kept the place up.").) He was paying no rent and would have no reasonable expectation that he was "effectively contributing to insurance payments." *Labombard*, 399 N.W.2d at 531. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.412; ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627.)

Promises to perform household chores are of nominal value and may not even offset the additional utilities expense of hosting Third-Party Defendant, let alone provide a monetary profit and, with it, funds to purchase insurance. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.407 (Plaintiff's testimony: "[Third-Party Defendant] took care of the outside, mowed the lawn, took care of any trees that fell down . . . took care of fencing, the barns, kept them up . . . kept the house clean."); ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627.) There is no claim or evidence that mowing the lawn, performing yard work, and cleaning the house equates to the fair market value of Third-Party Defendant's housing, or substantiates any belief that he was financially contributing to the home's maintenance. If anything, taking evidence in the light most favorable to

Defendant, Third-Party Defendant was residing with Plaintiff as a form of charity, not under obligations of commercial exchange. *Diebold, Inc.*, 369 U.S. at 655.

Michigan Court of Appeals opinion after *Labombard* have come to similar conclusions. In *Stefani v. Capital Tire, Inc.*, 425 N.W.2d 32 (Mich. Ct. App. 1988), the court found a tenant liable for its negligence in causing a fire because the tenant agreed to pay for and obtain fire insurance itself. The court reasoned that the tenant "could not reasonably [have] believe[d] that a portion of its rental payments was allocated to pay fire insurance premiums." *Id.* at 503; *see also Antoon v. Cmty. Emergency Med. Serv., Inc.*, 476 N.W.2d 479, 482 (Mich. Ct. App. 1991) (Tenant negligence liability was removed in *Labombard* "because when the lease agreement is silent regarding the duty of obtaining fire insurance, the lessee may reasonably expect that the rental payments will be used to cover the lessor's ordinary and necessary expenses, including fire insurance premiums."). *But see Reliance Ins. Co. v. East-Lind Heat Treat, Inc.*, 438 N.W.2d 648 (1989) (denying tenant liability where tenant paid rent and insurance premiums but was not required to obtain a fire insurance policy).

Third-Party Defendant would have no basis to form a reasonable expectation that he was financially contributing to Plaintiff's fire insurance policy. He similarly had no basis to think he was financially contributing to any basic expenses derived from property ownership. It is undisputed that Third-Party Defendant provided no more than simple, in kind services akin to household chores. (ECF No. 28, PageID.376, ¶ 7; *id.*, PageID.407; ECF No. 31, PageID.609, ¶ 7; ECF No. 31-2, PageID.627.) He paid no rent and unlike the tenant in *Stefani*, he contributed nothing to insurance premiums. 425 N.W.2d 32; *see also Reliance Ins. Co.*, 438 N.W.2d 648. There was no lease

agreement setting out legally enforceable obligations that Third-Party Defendant refrain from risky behavior, which was the case in *Labombard* and would have served as a regulatory substitute for negligence liability. 399 N.W.2d 527.

Third-Party Defendant cannot escape his general duty to refrain from dangerous behavior and rely on an exception created for rent-paying tenants. The court concludes that Third-Party Defendant is not entitled to judgment as a matter of law and will deny his motion. Fed. R. Civ. P. 56(a).

## IV. CONCLUSION

Plaintiff and Defendant agree upon coverage with regard to fire damage, post-fire damage caused by Plaintiff's neglect, and mold damage. Appraisal would be appropriate to determine the extent of covered loss. Nonetheless, Defendant has a valid fraud defense and a jury must decide it's remaining factual issues. Fed. R. Civ. P. 56(a).

Third-Party Defendant presents no dispute that he caused the fire that destroyed much of Plaintiff's property. He had a duty to Plaintiff and Defendant to refrain from negligent conduct. Liability cannot be excluded when there is no written lease agreement regulating risky behavior and there is no financial compensation for the tenant's housing. Accordingly,

IT IS ORDERED that Plaintiff Kathy Cox's Motion for Summary Judgment (ECF No. 26) is DENIED.

IT IS FURTHER ORDERED that Third-Party Defendant's Motion for Summary Judgment (ECF No. 28) is DENIED.

s/Robert H. Cleland                     /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  April 16, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 16, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner                                    /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\19-12235.COX.SummaryJudgmentx2.RMK.RHC.6.docx